# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **RAVEN JOHNSTON** | * | **CIVIL ACTION NO. 08 CV 1098** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Raven Johnston, born June 20, 1983, filed applications for disability insurance benefits and supplemental security income benefits on May 25, 2004, alleging disability as of May 10, 2004, due to bipolar disorder, migraine headaches, a seizure disorder, and insomnia.  After claimant was found not disabled by the Administrative Law Judge ("ALJ") by decision dated August 28, 2007, claimant filed an appeal.  By Notice dated May 30, 2008, the Appeals Council denied claimant's request for review.  This appeal followed.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence

in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:[1]

**(1) Records from Dr. Gary Blanchard dated January 14, 2003 to June 2, 2004**.  On January 14, 2003, claimant presented with anxiety and insomnia.  (Tr. 146).  Her anxiety was well-controlled with Zyprexa, but she could not tolerate the weight gain.  Her prescriptions for Seroquel, Elavil, and Gabitril were increased.

On November 12, 2003, claimant presented to the emergency room very combative, loud, and violent.  (Tr. 138).  She had a history of treatment for opioids dependence, mood disorder, and chronic migraine headache syndrome.  (Tr. 136).  She reported that both she and her mother had been beaten up by a former boyfriend, and that she had been raped in the past as well.  She admitted to smoking marijuana on occasion, but did not feel that it was significant.

---

[1]While all of the medical records were reviewed by the undersigned, only those pertaining to the issues on appeal are summarized herein.

Dr. Philip Landry, a psychiatrist, observed that claimant had been a very difficult patient to treat, because virtually all of her medications had had only limited benefit in treating her anxiety, headaches, and sleep disturbance.  The impression was bipolar disorder II.  (Tr. 138).

On December 8, 2003, claimant complained of insomnia.  (Tr. 127).  She had a history of Darvocet and other medication abuse, including sedatives.  She denied drinking, but smoked marijuana from time to time.

The consultative physician, Dr. Kevin R. Hargrave, questioned the accuracy of her sleep logs.  His impressions were multifactoral insomnia, probably with a poorly entrained biological clock, and a history of multi-drug abuse, rape, ongoing depression, and a poor relationship with her mother.  (Tr. 128).  He did not recommend a formal sleep evaluation, or sedatives, given her history of abuse. (Tr. 122).

On February 10, 2004, claimant reported that she was sleeping well, but her mood was very impulsive, unstable and irritable.  (Tr. 274).  She was prescribed Eskalith CR 450 mg., Seroquel 300 mg., and Elavil 100 mg.

### (2) Consultative Examination by Dr. Alfred Buxton dated July 15, 2004.

Claimant reported significant headaches and very bad mood swings.  (Tr. 147-48).  She also said that she had a tendency to self-mutilate and had rage reactions.  (Tr.

148).  She stated that she smoked about three-fourths of a pack of cigarettes daily, drank alcohol infrequently, and used no illicit drugs.  (Tr. 147).  Her medications included Amitriptyline HCL, Tegretol, Inderal, and Seroquel.

Claimant complained that she had chronic insomnia, but slept fairly well with her medication.  Her appetite was fair.  She had poor energy, and tired easily.

As to activities, claimant read, wrote poetry, and colored.  She was able to cook, clean, shop, manage money, travel, communicate, and manage time independently.

On examination, claimant's verbal receptive and expressive language skills were good.  Dress and groom were good.  Social skill was good.

Recent and remote memories were intact; however, she seemed to struggle with her attention and concentration, which appeared to be secondary to some arousal problems from medication effects.  Pace was even, with a mildly slow rate of performance and a normative response latency.

Intellect appeared to be within normal limits.  Judgment, reasoning, insight, and reflective cognition were good.  Cognitions were clear and cogent.  Mood was subdued, and affect was mood congruent.

Claimant had no evidence of any hallucinatory or delusional phenomena.  She reported occasional self-mutilation.  She denied any homicidal or assaultive

ideation, intent, or plans, but did occasionally have rage reactions.  Self-image was poor, and goal orientation was fair.  (Tr. 149).

Additionally, claimant was a chronic worrier.  She was easily upset, then attempted to escape and/or avoid the stressor.  She had episodic, reflective crying spells, frequent despondency, and was listless and lethargic due to mood swings and medication effects.

Dr. Buxton's impression was that claimant's intellect and adaptive daily living skills were within normal limits, though apparently there had been some compromise adaptively secondary to chronic severe headaches combined with emotional problems and medication effects.  She was regarded as being competent to manage her own personal affairs.  Clinically, she presented with bipolar disorder, with degree of impairment moderate and prognosis guarded; insomnia, with degree of impairment moderate and prognosis fair to guarded, and poor psychological response to stress, with degree of impairment moderate and prognosis fair to guarded. Additionally, she presented with maladaptive health behavior negatively affecting medical condition as to her cigarette smoking and mild asthma.

Dr. Buxton recommended continued outpatient mental health intervention, probably long-term as opposed to brief.  Claimant's Global Assessment of

5

Functioning Score ("GAF") was 60 over the previous 12 months.  He determined that claimant could understand both simple and complex instructions and directions within a work setting.  He noted that she might have difficulty sustaining attention and concentration over a protracted period of time secondary to headaches, mood disorder, and medication effects.

Additionally, Dr. Buxton found that at a minimally adequate level, claimant should be able to establish relationships with co-workers and supervisors.  He determined that she would probably have some difficulty tolerating stress and frustration in the job setting, and would probably have exacerbation in overall symptomatology.  (Tr. 150).

**(3) Records from University Medical Center (UMC) Psychiatric Unit and Dr. Joseph Henry Tyler Mental Health Clinic ("Tyler MHC") dated July 26, 2004 to November 4, 2004**.  Claimant was admitted for bipolar disorder, recent depressed episode, polysubstance dependence, and migraine headaches.  (Tr. 153).  Her GAF score was 20 on admission, and 56 on discharge.  She was referred to the Dr. Joseph Henry Tyler Mental Health Clinic.

At Tyler MHC, claimant was placed on medications.  (Tr. 155–63).  She would not take Depakote because it was causing her to gain weight.  (Tr. 156,

159).  On November 3, 2004, claimant reported positive improvement from medication changes.  (Tr. 320).

**(4) Residual Functional Capacity Assessment ("RFC") – Mental and Psychiatric Review Technique ("PRT") Form dated October 5, 2004**.  Dr. Joseph Kahler, Ph.D., determined that claimant was moderately limited as to her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers. (Tr. 175-76).  Dr. Kahler found that claimant appeared to be capable of simple work in a relatively low stress environment with low social demands.  (Tr. 177).

In the PRT, Dr. Kahler assessed claimant for affective disorders and substance addiction disorders.  (Tr. 178).  He found that she had moderate difficulties in maintaining social functioning and concentration, persistence, or pace.  (Tr. 188).  He determined that she had had one or two episodes of decompensation.  The evidence did not establish the presence of the "C" criteria under listing 12.04.  (Tr. 189).

**(5) Records from UMC dated June -August, 2005**.  Claimant complained of headaches and seizures.  (Tr. 325).  An MRI of the brain was normal.  (Tr. 336).  The assessment was new-found tonic-clonic seizure, two episodes, for which she was prescribed Depakote ER 500 mg.; bipolar disorder, and migraines.  (Tr. 332).

**(6) Records from Lafayette General Medical Center ("LGMC") dated August 6, 2004 to August 19, 2005**.  Claimant reported having had two seizures.  (Tr. 408).  Two EEGs were negative for seizure activity.  (Tr. 408, 410, 412).

On examination, Dr. David Dawes found that claimant's recent memory was inconsistent, as she tended to "blank out" at times.  (Tr. 415).  She had a history of abusing opiate pain medications, including Lortab.  (Tr. 414).  He was not convinced that she was bipolar.  (Tr. 415).

Dr. Dawes' impression was mood disorder, NOS, dissociative disorder, generalized anxiety, borderline personality disorder, and questionable seizures.  Claimant's GAF score was 50, with 60 being the highest for the previous year.

**(7) Records from Opelousas Mental Health dated November 30, 2004 to August 8, 2005**.  Claimant was treated for bipolar disorder.  (Tr. 460).  Her treatment included counseling and medications, including Inderal, Seroquel, Elavil, Vistaril, Seroquel, Paxil, Lexapro, Cymbalta, and Trazodone.  (Tr. 444, 448, 451, 455, 460).

**(8) Records from Tyler MHC dated August 24-30, 2005**.  Claimant complained of hearing and seeing things.  (Tr. 484).  She had smoked marijuana and used Lortab in the previous six months, but denied current or past alcohol use.  (Tr. 474, 487).  The diagnoses were bipolar disorder, psychosis, and polysubstance dependence.  (Tr. 468, 489).

**(9) Records from UMC dated June 25, 2002 to February 3, 2006**.  On September 8, 2005, claimant reported a history of seizures beginning two months prior.  (Tr. 518).  An EEG was normal.

On January 13, 2006, claimant presented with suicidal thoughts and cuts to her bilateral upper thighs with a knife.  (Tr. 501).   The diagnosis was migraines.  (Tr. 502).

**(10) Records from Tyler MHC dated September 28, 2005 to September 18, 2006**.  Claimant was admitted on January 13, 2006 for depression, anxiety, and drug abuse.  (Tr. 539, 545).  She was using cocaine, marijuana, and ecstacy.  (Tr. 548).  Her GAF score was 36, and 58 for the past year.  (Tr. 536).

At discharge, claimant was still minimizing her drug abuse, and wanted others to cure her.  (Tr. 538).  The diagnoses were bipolar disorder, cannabis dependence, cocaine dependence, ecstasy abuse, substance induced mood disorder, anxiety disorder, NOS, borderline personality disorder, seizure disorder,

9

NOS, thrush, and migraine headaches.  (Tr. 536, 550).  She was prescribed Seroquel, Tegretol, Etrafon, and Prozac.  Her GAF score was 60.

**(11) Records from Opelousas General Health System dated December 21, 2006 to February 5, 2007**.  On December 21, 2006, claimant was admitted for a seizure.  (Tr. 613).  A CT scan of the head was normal.  (Tr. 612).

On January 20, 2007, claimant was admitted for a drug overdose.  (Tr. 617). She denied a suicide attempt.  A drug screen was positive for amphetamines, barbiturates, and cannabinoids.  (Tr. 691).   The assessment was bipolar disorder, drug abuse, and an unintentional overdose.  (Tr. 615).

**(12) Records from Acadia Vermilion Hospital from January 22-29, 2007**.  Claimant was admitted for major depression.  (Tr. 736).  She claimed that she had not abused drugs for three years since going to rehab in 2005.  (Tr. 765). Her GAF score was 20 on admission, and 40 for the previous year.  (Tr. 712).

On discharge, claimant's diagnoses were bipolar disorder, depressed, and opiate dependency.  (Tr. 706).  Her GAF score was 40.  Her prognosis was guarded.  She was encouraged to attend AA/NA meetings and to obtain a sponsor.

**(13) Records from Margaret Dumas Health Center dated March 2 to June 22, 2007**.  Claimant presented for aftercare following her admission to Vermilion Hospital.  (Tr. 856).  The diagnoses were bipolar disorder, Type I, most

recent episode with psychotic features and interepisode recovery with rapid cycling, GAD, PTSD, and panic disorder with agoraphobia.  (Tr. 859).  She was placed on Cymbalta, Thorazine, Depakote, Vistaril, and Ambien.  Her prognosis was guarded.  GAF score was 55, and 20 for the past year.

In the Psychosocial Assessment dated April 3, 2007, Joyce Fisher, GSW, reported that claimant was taking Cymbalta, Depakote, and Seroquel.  (Tr. 878). Claimant stated that she was sleeping better, but still felt depressed.  Her affect/mood was calm and polite.  She admitted to some paranoia when she left the house.  She refused any referrals at that time.

**(14) Records from Baton Rouge General Medical Center dated May 25, 2007**.  Claimant was admitted after a motor vehicle accident with rollover.  (Tr. 862).  She reported that she had had a seizure prior to the accident, and had been off of phenobarbital for three days.  She complained of a severe headache and mild neck pain.  X-rays showed some slight reversal of cervical lordosis, but were otherwise normal.  (Tr. 869).  A CT scan was negative.  (Tr. 870).

The diagnosis was musculoskeletal pain.  (Tr. 871).  Claimant was instructed to take medications as directed and to not drive.

**(15) Claimant's Administrative Hearing Testimony**.  At the hearing on July 26, 2007, claimant was 24 years old.  (Tr. 895).  She testified that she was 5

11

feet 3 inches tall, and weighed about 129 pounds.  She stated that she had lost about six pounds recently.

Claimant reported that she lived with her boyfriend.  Prior to that, she lived next door to her parents.  (Tr. 896).  She had a driver's license, but had had a seizure recently and had not been driving.

Claimant had a twelfth grade education.  (Tr. 897).  She attended massage therapy school, but did not finish.

As to work experience, claimant worked in home health for a quadriplegic and a wheel-chair bound patient for about two months.  Additionally, she had worked as a cashier and a pizza maker.  (Tr. 898).  She reported that she had stopped working because of her migraines.  (Tr. 899).

Claimant testified that her migraines occurred more than once a week, and sometimes lasted several days.  She stated that she was taking Topamax for them.  (Tr. 900).  She reported that she had been taken off of seizure medications.

As to seizures, she stated that she had had one in May, and two episodes after that.  She reported that she smoked half a pack of cigarettes per day.  She testified that she had last used cocaine and other drugs about five or six years ago.  (Tr. 901).  She stated that she had taken ecstasy once.  (Tr. 902).  Additionally, she said that she drank alcohol "[v]ery, very seldom."  (Tr. 915).

Regarding medications, claimant testified that she was taking Seroquel and Phenobarbital.  (Tr. 903).  She stated that the medications had helped her seizures. (Tr. 904).

As to activities, claimant testified that she cleaned her house, washed the dishes, and did her own laundry sometimes.  She stated that she did not grocery shop because she did not drive.  (Tr. 905).  She reported that she had a very hard time with concentrating and completing tasks.

Claimant said that she was going to the Margaret Dumas mental health clinic for treatment once a month.  (Tr. 905-06).  She stated that it had been helping her.  She reported that she would like to go back to school.  (Tr. 907).

Additionally, claimant stated that she enjoyed listening to music.  She stated that she watched television at night sometimes.  She said that she spent three or four days a week with a headache, and just laid in bed with a wet washcloth on her head.  (Tr. 908).

Claimant also said that she had bipolar disorder and depression.  (Tr. 911). She stated that she had agitation, where her heart raced and her face flushed.  She reported that she was agitated about five days a week, and depressed about three days per a week.  (Tr. 912).

**(16) Administrative Hearing Testimony of Claimant's Mother, Sherrie Johnston**.  Claimant's mother testified that her daughter had problems with headaches and dealing with life.  (Tr. 921).  She stated that claimant could not take care of herself, forgot, and had anxiety attacks so bad that she could not walk or hardly talk.  (Tr. 922).

Ms. Johnston testified that claimant colored, read a little, and watched television.  She reported that claimant did her own laundry sometimes, but she sometimes did not finish it.  She said that claimant used to drive her car to the store three times a week.  She further stated that claimant forgot to take her medicines.  (Tr. 926).

**(17) Administrative Hearing Testimony of Claimant's Father, Ricky Johnston**.  Claimant's father testified that claimant had problems with migraines, bipolar disorder, and depression.  (Tr. 933).  He said that claimant's headaches were so bad that they had to take her out of school and home school her.  (Tr. 935).  He stated that claimant could not handle work because of her migraines. (Tr. 936).

**(18) Administrative Hearing Testimony of Lionel Bordelon, Vocational Expert ("VE")**.  Mr. Bordelon described claimant's past work as a cashier as light with an SVP of three; personal care attendant as light with an SVP of three;

14

pharmacy tech as light with an SVP of three, and fast food worker as light with an SVP of two.  (Tr. 940).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience; who had no exertional limitations, but could not work around heights or dangerous machinery because of a seizure disorder; could not do complex work because of emotional problems; could do work which required her to follow one, two, and three-step instructions, and required work with limited interaction with the general public. (Tr. 940-41).  In response, Mr. Bordelon identified the jobs of file clerk, of which there were 298,526 positions nationally and 3,539 statewide, 50% of which would fit the hypothetical; assembler, of which there were 1,233,669 nationally and 6,263 statewide, 25% of which would fit the hypothetical, and hand packers, of which there were 363,980 positions nationally and 2,922 statewide, 25% of which would fit the hypothetical.  (Tr. 941).

When the ALJ changed the hypothetical to assume a claimant who had headaches once or twice a week, lasted for a few days, and prevented her from working during that period, Mr. Bordelon testified that claimant would not be able to do any of these jobs or any other jobs on a sustained basis.  The VE also confirmed that she would not be able to do any jobs if she missed most of a week

each month because of migraine headaches or manic episodes which would interfere with attendance four or five days a month.  (Tr. 942).

**(19) The ALJ's findings are entitled to deference**.  Claimant argues that: (1) the ALJ erred in failing to find that claimant was disabled and entitled to benefits; (2) alternatively, the ALJ erred in failing to find that claimant was disabled for a time and entitled to a closed period of disability benefits; (3) alternatively, the ALJ erred in finding that claimant's alleged substance abuse precluded her from receiving benefits, and (4) the ALJ erred in finding that claimant's testimony and complaints of pain were not credible.

First, claimant asserts that the ALJ erred in finding that she was not disabled either permanently or for a closed period.  Specifically, she asserts that her primary disabilities are bipolar disorder and migraine headaches, not substance abuse.

The Social Security regulations provide that alcohol and/or drug addiction that materially contributes to disability cannot be the basis for an award.  *See*, *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).  "Material" means that a person would not be found disabled (based on his other impairments) if he stopped using drugs and/or alcohol.  20 C.F.R. §§ 404.1535 and 416.935; *Hearings, Appeals and Litigation Law Manual* (HALLEX) Section I-5-314 (Nov. 14, 1997).

16

In the Decision, the ALJ specifically considered Listing 12.04 for affective disorders, as well as 12.09[2] for substance addiction disorders.  20 C.F.R. Pt. 404, Subpt. B, App. 1.  (Tr. 15).  He found that with the substance abuse, claimant's bipolar disorder met the listing at 12.04.  However, he found that the substance abuse was material to the finding of disability, meaning that if claimant stopped the substance abuse, then she would not  have an impairment or combination of impairments that met or medically equaled any of the impairments in the listing. (Tr. 16, 20).

The record reflects that claimant was admitted multiple times for mental problems.  (Tr. 153, 460, 484, 501, 539, 617, 856).  However, on almost every occasion, alcohol or drug abuse was involved.  (Tr. 127, 136, 153, 414, 468, 474, 487, 536, 691, 706).

Section 12.04 provides as follows:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

---

[2]Section 12.09 for substance addiction disorders requires that claimant have behavioral or physical changes associated with regular use of alcohol as well as satisfy the requirements in any of the following listings: organic mental disorders, depressive syndrome, anxiety disorders, personality disorders, peripheral neuropathies, liver damage, gastritis, pancreatitis, and seizures.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions or paranoid thinking;

*      *      *

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

18

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 CFR Pt. 404, Subpt. P, App. 1, § 12.04.

While claimant has demonstrated that she met the criteria of subsection A of § 12.04, she has not shown that she met the B or C requirements of this listing. Neither Dr. Buxton nor Dr. Kahler found any marked areas of limitation as required under B, nor did they find evidence of a chronic affective disorder under C. (Tr. 149-50; 175-76, 189). Further, Dr. Dawes was not convinced that she was bipolar, and found that her seizures were "questionable." (Tr. 415).

For a claimant to show that her impairment matches a listing, it must meet *all* of the specified medical criteria. (emphasis in original). *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990). An impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Id.* As claimant has not demonstrated that she met all of the criteria under § 12.04, the ALJ's finding that claimant's impairment did not meet this listing is entitled to deference.

Additionally, the records reflect that claimant's seizures, anxiety and insomnia were controlled on medication.  Claimant told Dr. Buxton and Dr. Hargrave that she slept well with her medication.  (Tr. 148, 274).  Additionally, she reported positive improvement from medication changes.  (Tr. 320).  If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Further, the record is replete with instances in which claimant failed to comply with prescribed treatment.  For example, she would not take Depakote or Zyprexa because she could not tolerate the weight gain.  (Tr. 146, 156, 159).  Additionally, she admitted that she had stopped taking her seizure medication for three days prior to an automobile accident.  (Tr. 862).  It is well established that failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 404.1530(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990).

Claimant also argues that the ALJ erred in assessing her credibility. [rec. doc. 8, p. 7].  The ALJ found that claimant's testimony regarding her drug use was inconsistent with the medical evidence of record.  (Tr. 19).  While claimant testified that she had not used drugs since age 19 and told Dr. Buxton that she did not use illicit drugs, the record reflects that she had a history of repeated substance abuse.

20

(Tr. 127-28, 147, 901-02).  Additionally, Dr. Hargrave questioned the accuracy of her sleep logs.  (Tr. 127).

It was within the discretion of the ALJ to discount her complaints based on the medical reports combined with her daily activities and her decision to forego certain medications.  *Griego v. Sullivan,* 940 F.2d 942, 945 (5th Cir. 1991).  Further, it is well established that conflicts in the evidence are for the Commissioner and not the courts to resolve.  *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).  Thus, the ALJ's finding as to credibility is entitled to great deference.  *Id.* at 458.

Finally, claimant argues that she is unable to engage in substantial gainful activity on a day-to-day basis, citing *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986) [rec. doc. 8, p. 9].  However, since the issuance of its decision in *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002), the Fifth Circuit has determined that the Commissioner is not required to make a specific finding regarding the claimant's ability to maintain employment in every case.  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  As the court stated in *Frank*:

> *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms.  For example, if [plaintiff] had alleged that her degenerative disc disease prevented her from maintaining employment because every

21

number of weeks she lost movement in her legs, this would be relevant to the disability determination.  **At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time**.  An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination.   Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment.  Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required.

(emphasis added).  *Id*. at 619.

Here, claimant has not demonstrated that her symptoms were of sufficient frequency or severity to prevent her from holding a job for a significant period of time as required by *Watson*.  Neither Dr. Buxton nor Dr. Kahler found that her alleged symptoms would prevent her from working.  (Tr. 149-50; 177).  Thus, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk

of Court.  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed  November 3, 2009, at Lafayette, Louisiana.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE